IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

F L D

FEB 2 0 2008

RICHARD C. DEVINE,
        Plaintiff,

v.                                          Civil Action No. 5:06cv136

MICHAEL J. ASTRUE,[1]
COMMISSIONER OF SOCIAL SECURITY,
        Defendant.

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain

judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying

his claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB")

under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433,

1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been

referred to the undersigned United States Magistrate Judge for submission of proposed findings of

fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I. Procedural History

Richard C. Devine ("Plaintiff") originally filed applications for DIB and SSI on December

3, 1996, alleging disability as of March 31, 1996, due to heart and vision problems and Post

Traumatic Stress Disorder ("PTSD"). Plaintiff last met the insured status requirements of the Act

on September 30, 2000, and therefore must establish that he was disabled prior to that date in order

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security.
Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be
substituted, therefore, for former Commissioner Jo Anne B. Barnhart (or Acting Commissioner
Linda L. McMahon [if the caption was changed previously]) as the defendant in this suit. No
further action need be taken to continue this suit by reason of the last sentence of section 205(g)
of the Social Security Act, 42 U.S.C. §405(g).

to be insured for DIB. 20 CFR § 404.101. The applications were denied initially and on reconsideration. Administrative Law Judge ("ALJ") Frederick Moncrieff issued an unfavorable decision on July 31, 1998. Upon review, the Appeals Council returned the claim to the ALJ for a new hearing and decision specifically addressing Plaintiff's mental impairments and residual functional capacity ("RFC") with testimony of a Vocational Expert. A hearing was subsequently held on October 30, 2001, by ALJ Barry Anderson. Plaintiff, represented by counsel, testified, along with his wife, Theresa Devine, and Vocational Expert Timothy Mahler ("VE"). ALJ Anderson rendered a decision on November 27, 2001, finding that Plaintiff was not disabled as defined by the Social Security Act, at any time through the date of his decision. The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.

Plaintiff appealed the Commissioner's decision to this Court. The undersigned United States Magistrate Judge entered a Report and Recommendation on November 3, 2004, which the District Court (United States District Judge Robert E. Maxwell) affirmed and adopted on January 27, 2005, remanding the case to the Commissioner for further proceedings in accord with the Report and Recommendation. Upon remand, a hearing was held by ALJ Karl Alexander on August 25, 2005 (R. 477-503). ALJ Alexander issued an unfavorable decision on July 5, 2006 (R. 477-501). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.

## II. Statement of Facts

Richard C. Devine ("Plaintiff") was born on June 2, 1951, and was 50 years old at the time of the Administrative Hearing (R. 71). He has a high school education and four-plus years of college. His past relevant work experience includes being a computer teacher, self-employment in

computer repair and training, and as an operator of an alternative energy store (R. 79, 81, 99).

Plaintiff complained of marital discord, agitation, insomnia, depression, and chest pains with stress in relation to marital problems 1987.[2] He told doctors at the Veterans' Administration at that time that he divorced his first wife in 1984. She took their children to Texas. Plaintiff remarried in 1986. He and his present wife went to Texas in December 1986 or early 1987 to see his children. In fact, he quit his job as a teacher to make the trip. Plaintiff reported that his ex-wife's parents threatened to blow his head off. During the trip he and his new wife began having marital difficulties, and he admitted to hitting his new wife. Ten days before the office visit, Plaintiff's wife told him she was pregnant. He stated that he "made her stand out in the rain." The day before the office visit he told his wife he wanted a divorce. At the office visit he stated he loved his wife, but was "all mixed up." He stated that if he got mad, he could kill his wife and her father. His wife left him and all attempts to contact her were unsuccessful. He was diagnosed with an adjustment disorder with depressed mood at that time. Plaintiff left his treatment at the Veterans' Administration ("VA") against medical advice before a complete examination could be performed.

Plaintiff was admitted to the hospital on March 31, 1996, with complaints of several days of intermittent vague chest pain which seemed to be between his shoulder blades, going to the front of his chest. His family reported observing frequent brief episodes of Plaintiff staring into space and acting confused, while clenching his left hand as though he had something in it. Plaintiff reported a past medical history of PTSD and reported a total loss of memory since the Vietnam war due to exposure to Agent Orange. He was on no medications. Dr. High, Plaintiff's family doctor, assessed

---

[2]Neither party objected to the prior Report and Recommendation entered by the undersigned in November 2004. The facts are therefore taken from that Report and Recommendation up until September 2001, the last evidence in that case. See 2:02cv38.

possible complex partial seizures versus anxiety attacks. Plaintiff was admitted to the hospital to rule out ischemia, TIA's, or other unusual neurologic phenomena.

A CT scan of the head was normal. A carotid doppler study was negative. A carotid ultrasound was normal. Chest x-ray was normal, with lungs and heart unremarkable. An echocardiogram showed mitral valve prolapse with minimal mitral regurgitation. A stress thallium test showed partial anterior wall reversibility. Plaintiff elected to have catheterization which was scheduled for the 4th of April. It was noted that Plaintiff's "vague neurologic symptoms" seemed to improve during the hospitalization.

This date, March 31, 1996, is Plaintiff's alleged onset date.

After extensive diagnostic testing, Plaintiff was discharged on April 3, 1996, in stable condition, with a diagnosis of angina. A coronary arteriography in April 1996 was normal, with good functioning.

On April 20, 1996, Plaintiff presented to Dr. Scott Dove, D.O. as a new patient. He came to him for a second opinion regarding his multiple complaints including chest pain, visual changes, and episodes of dizziness and confusion, especially at night. He also reported changes in his short-term memory since Vietnam, episodes of nervousness, and episodes of what was referred to as "paranoid behavior," worrying about things such as illness in his children and his own mortality. Upon psychiatric examination, Plaintiff was alert, oriented, and appropriate, but appeared very anxious. His judgment was acceptable. He could perform serial seven's. He had no homicidal or suicidal ideations, delusions or hallucinations. Dr. Dove assessed Plaintiff as having "probable" PTSD and a mitral valve prolapse with mild regurgitation.

On May 4, 1996, Dr. Dove noted Plaintiff was doing somewhat better on his medication, but

was unable to take the full dose, as it made him too dizzy. Sometimes he forgot to take the medication totally. He felt "some better but not back to par." He continued to feel very stressed and anxious. His appetite was stable but he had trouble sleeping. He reported being unable to continue his computer work "because of the increasing stress and demands." Upon exam, Plaintiff appeared somewhat anxious. His judgment was in good shape and his recall was "excellent." Dr. Dove diagnosed PTSD, mitral valve prolapse, and probable gastritis.

On May 22, 1996, plaintiff presented to the emergency room (ER), complaining of two to three-second episodes during which he had difficulty controlling his thought processes. He also complained of ringing in his ears and tightness in his chest. After an examination, the impression was that Plaintiff was suffering from hyperventilation and he was instructed to call his family doctor for a follow-up.

On June 1, 1996, Dr. Dove reported that Plaintiff was doing better since starting on Buspar. He was doing relatively well in the daytime, but worse in the evening, with episodes of hyperventilation, complications, chest tightness, feelings of doom, and increasing anxiety at evening time. His days were usually pretty good. That same date Plaintiff told Dr. Dove he wanted to discontinue the Buspar because he felt it was giving him "a buzz." Dr. Dove told him it was all right to taper the dosage of Buspar to a tolerable level. Upon exam, Plaintiff appeared somewhat anxious with hand wringing and somewhat pressured speech. He reported that the day before he had "an episode of somewhat aggressive behavior in which at graduation he pushed a gentleman from behind who had crossed his path so that he could see his daughter graduate from high school." He also noted again that his daughter was leaving for college in Texas where her mother lived, and this was creating stress. He denied any hallucinations, illusions or delusions and continued to function at

work. Dr. Dove diagnosed PTSD, panic disorder secondary to PTSD, mitral valve prolapse, and probable gastritis.

On June 7, 1996, Plaintiff told Dr. Dove he continued to have headaches, although his anxiety, nervousness, and panic attack had diminished in frequency. He was feeling better with much improved days and nights, except for the headache discomfort. Dr. Dove told him to use Tylenol for the headaches.

A radiology report dated June 8, 1996, demonstrated no radiopaque metallic foreign bodies in the periorbital region. An MRI of the head that same day found no acute intracranial processes and no focal abnormalities at the level of the temporal lobes. A two centimeter mucus retention cyst, was, however, found at the base of the right maxillary sinus. This was determined to be asymptomatic, and an unlikely cause of Plaintiff's vision changes or headaches. The MRI was otherwise unremarkable.

On June 24, 1996, Plaintiff told Dr. Dove he still had episodes of anxiousness. Upon examination, Plaintiff's recall was intact without problems, and he had no delusions, illusions, or hallucinations. Dr. Dove noted Plaintiff was somewhat noncompliant with his prescriptions. He was diagnosed with PTSD, history of mitral valve prolapse, and history of gastritis resolved.

Plaintiff underwent a neurological consultation with Dr. Shiv Navada on July 3, 1996. Upon examination, he "seemed anxious." Dr. Navada noted he "had considerable difficulty describing his symptoms succinctly." He avoided eye contact at times. Dr. Navada's impression was "Headache, visual blurring, and paresthesias of undetermined etiology," and "Anxiety disorder suspected."

On July 10, 1996, Plaintiff told Dr. Dove he had a new complaint of some heartburn. Otherwise his symptoms remained pretty much unchanged. He was having some difficulty with the

Buspar because it made him feel "drunk." Ativan provided some relief. He had bad dreams for the past three to four nights. Dr. Dove diagnosed PTSD, gastritis, and gastroesophageal reflux disease ("GERD"). He discontinued the Buspar.

An EEG conducted on July 12, 1996, was normal.

On July 19, 1996, Dr. Navada wrote to Dr. Dove that Plaintiff had had no further headaches since he was last seen, but still "just does not feel right." He noted Plaintiff was prescribed Zoloft but discontinued it himself because "he did not feel right." He also reportedly saw Dr. Brian Ellis, who did not find anything obvious. Dr. Navada's impression was "multiple somatic complaints of unclear etiology." He was "inclined to believe that Plaintiff's symptoms were probably anxiety related."

On July 24, 1996, Plaintiff told Dr. Dove he had been doing somewhat better, but still had diffuse tenderness over his abdomen with increased distention. He was not taking his Zoloft, as he said it made him dizzy with some imbalance. He was also off Buspar. He stated he still had "some anxious moments but he trie[d] to deal with those and they [were] short lived." He was doing quite well on Ativan. He was "still anxious at times." Dr. Dove diagnosed PTSD, anxiety disorder secondary to PTSD, possible borderline personality, gastritis, and Mitral valve prolapse.

On August 19, 1996, Plaintiff presented to the Veterans Administration Hospital ("VA") with complaints of chest pains at times, and a great deal of stress. He was referred for a psychiatric evaluation to rule out PTSD.

On August 28, 1996, the VA denied Plaintiff's disability application because none of his symptoms were among those found to be related to Agent Orange exposure. Further, as to his PTSD claim, the VA found no confirmed diagnosis of PTSD and no evidence establishing that a stressful

experience sufficient to cause PTSD actually occurred.

Dr. Attia evaluated Plaintiff for PTSD on September 9, 1996. Plaintiff reported multiple somatic complaints, such as pain and blurred vision. He was diagnosed with an adjustment disorder with anxious mood. It was recommended he undergo a PTSD evaluation.

On September 12, 1996, Plaintiff told Dr. Dove he was doing fairly well, pretty much the same. He still "continue[d] to fluctuate as to his compliance with the medicines that have been prescribed." Except for an anxious-appearing mood and affect, Plaintiff's mental status exam "remain[ed] unremarkable." Dr. Dove diagnosed PTSD, probable affective disorder with anxiety, history of mitral valve prolapse, and possible gastroesophageal reflux disease ("GERD").

On September 24, 1996, Plaintiff followed up at the VA for multiple unrelated symptomatic complaints – i.e., chest discomfort, patches of feeling cold on the skin, and diminished vision. He revealed morbid thoughts and reported these were usually violent and related to his loved ones. He was encouraged to stay for a brief inpatient stay for further evaluation.

A report dated October 28, 1996, indicated Plaintiff was still having disturbing thoughts about his children. He had poor eye contact, was fidgety, and tended to mumble. He expressed fear of taking any medications because he was afraid they might kill him.

On November 6, 1996, Plaintiff presented to the VA Medical Center for evaluation for possible Agent Orange exposure. He complained of chest pain, episodes of dizziness, and muscle spasms. The impression was "rule out PTSD," skin lesion on right thigh, coronary artery disease, mild mitral regurgitation, history of muscle spasms of unknown etiology, and possible degenerative joint disease. He was advised to take one baby aspirin daily with food. It was noted that Plaintiff was diagnosed with coronary artery disease and adjustment disorder with depressed mood, both in 1987.

On November 19, 1996, Plaintiff told Dr. Dove he was doing about the same. He reported that he had seen the doctors at the VA on two occasions, including the psychiatrist, and was "rather dissatisfied with their evaluations and therapies." On mental status examination, Plaintiff's mood was slightly anxious, and his affect was neutral. Dr. Dove diagnosed mitral valve prolapse, PTSD with anxiety component, and GERD.

Plaintiff filed for SSI and DIB on December 3, 1996, alleging disability since March 31, 1996.

On December 11, 1996, Plaintiff presented to Dr. Dove for follow up of his mitral valve prolapse, anxiety disorder, PTSD and GERD. He stated he had been doing "quite well." He was doing much better on his medication, and had no further palpitations, chest pains or discomforts. He reported an increased amount of stress recently as his 18-year-old daughter dropped out of college and wanted to move out of their house, and live with a cousin in Texas. He knew the cousin used cocaine. He denied any pain or discomfort, but still related marked episodes of forgetfulness "and inability to function in his profession as computer operator and repair." He noted he could not remember very well any of his education or training.

Upon examination, Plaintiff appeared somewhat anxious but improved from prior evaluations. Mental Status exam showed Plaintiff to be doing quite well. He did have difficulty with abstract reasoning as well as recall, and demonstrated a fair amount of difficulty with serial sevens. Dr. Dove diagnosed mitral valve prolapse, stable and PTSD stable with anxiety component.

On January 6, 1997, the VA again denied Plaintiff's PTSD disability claim. The VA's reasoning was that Plaintiff did not receive any combat awards and did not furnish any information concerning the claimed life threatening episodes.

Plaintiff next saw Dr. Dove on January 28, 1997. Plaintiff reported continued panic attacks. He said he had tried to work for a day and a half, but had a panic attack which was only relieved after going to bed for several hours. He had been evaluated extensively in the VA Medical Center PTSD Clinic, but told Dr. Dove he was "unsatisfied with their help." Upon examination, Plaintiff was "somewhat anxious in appearance with a constrained facies and some hand ringing." His abstract reasoning and judgment were intact and stable, and he denied suicidal or homicidal ideation, hallucinations, illusions, or delusions. He was diagnosed with mitral valve prolapse and anxiety disorder with panic attacks.

On January 30, 1997, Dr. High reported that he had treated Plaintiff from January 1991 until September 1995, that Plaintiff had reported having PTSD and exposure to Agent Orange, but that he had not treated nor evaluated him for those problems, and did not know who diagnosed them.

On February 7, 1997, Plaintiff present ed to Dr. King "for a second opinion regarding his experience in Vietnam, and symptoms related to those experiences." He told Dr. King he had "finally" associated his "severe ankle pain" to an experience where there was a jet fuel explosion at an ammunition dump, which "blew him off his cot." He could feel the heat of the flames and the height of the flames caused him to feel that "the world was coming to an end." He also reported a "more prominent memory" that was "recurrent and intrusive," where he saw a 4-5 year old male child fall off a truck in front of him and his truck ran over the child. He also reported memories of "numerous situations where Americans would hunt and kill the natives 'for laughs;'" that a native woman with whom he was living and had a sexual relationship refused to give the MP's at the gate money so she could enter for work and the MP's "shot her to death;" a "multitude of experiences where Americans and Vietnamese were killing each other and themselves, where drug deals gone

foul would lead to killing of one American by another;" and a situation where he was in a hootch with 40 Vietnamese women when the Vietcong attacked and the women became hysterical and he had to walk over them.  Regarding the latter incident, he "was not able to make direct reference to his actions that led to 'murder,' which has haunted him ever since."  He now described his dreams as "wild and crazy" and relevant to themes of killing and death, where people would be running around and dying, mostly civilians.  Dr. King diagnosed PTSD.

On February 10, 1997, State agency consultative physician Hugh Brown, M.D., completed a Physical Residual Functional Capacity Assessment ("RFC"), opining Plaintiff had no exertional or nonexertional physical limitations.  He noted he had reviewed records from June 1996 through January 1997.

On February 19, 1997, Plaintiff requested a date from the VA to enter its  inpatient PTSD treatment program.  He was scheduled to enter on June 23, 1997.

On March11, 1997, Plaintiff continued to complain to Dr. Corder (an associate of Dr. Dove) of his heart racing, and feeling like the room was closing in on him.  He also complained of shortness of breath, facial numbness, and sweating hands.  He said he was unable to work because of these episodes.  Dr. Corder's impression was "panic attacks."  He prescribed Paxil.

Plaintiff underwent a consultative psychological examination by Dr. William Fremouw, Ph.D., at the request of the State agency on March 14, 1997.  Upon mental status exam, Plaintiff had little eye contact and talked in great detail about his somatic problems, such as his chest hurting, feelings of doom, feelings of jumpiness, and visual trails when he moved his head quickly.  His thought processes showed he was very bright.  He could recall seven digits forward and four backward.  Intelligence testing showed him to be in the superior range of intelligence at 123 full

scale IQ. He denied any delusions or hallucinations. He had feelings of doom, worries about his health, and feelings he was dying, despite medical reassurances. His sleep was poor, his appetite was stable, his weight was stable, and his energy level was low. He said he was "waiting to die from his physical problems which [were] undiagnosed." He related that his best friend died two years ago from a heart attack, and Plaintiff felt he was following that pattern.

Plaintiff's daily activities began with getting up at 6:00 a.m., and helping get his five children off to school. He would then take his wife to the store. Afterward, he would go to work at his office trying to organize his desk, but not getting anything done. He then took a nap in the afternoon, and watched television for an hour. He then picked his children up from school and took them to activities, such as scouts. He tried to avoid busy places, stating he was afraid it would "trigger a spell." He went to church with his family occasionally. He had liked fishing and football, but could not concentrate on them. He avoided working on computers, fearing they would "trigger a spell." He did not socialize much.

Dr. Fremouw noted Plaintiff had "a variety of vague, hard to diagnose physical complaints which began at the end of taking computer school and he had a friend who had similar complaints and died from them." He also noted Plaintiff did not specify any trauma which would lead to PTSD. He related panic attacks. Dr. Fremouw noted Plaintiff's major defining characteristic was "of the physical symptoms and complaints and the absence of physical findings."

Dr. Fremouw diagnosed somatization disorder and anxiety disorder. He opined that Plaintiff was competent to manage benefits. He also indicated that Plaintiff "definitely" needed to remain in outpatient psychiatric care and intensify treatment. He further opined that Plaintiff was not malingering and his symptoms were interfering with his prior high level of functioning as a self-

employed computer consultant.

Dr. Frank D. Roman, Ed.D., completed a Psychiatric Review Technique ("PRT") on March 19, 1997, opining that Plaintiff did have an anxiety disorder and somatoform disorder, but finding he would have only a slight restriction of activities of daily living, moderate difficulties in maintaining social functioning, seldom would experience deficiencies in concentration, persistence or pace, and once or twice had episodes of deterioration or decompensation in work or work-like settings. Dr. Roman also completed a mental RFC assessment, opining Plaintiff was moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Otherwise, he found Plaintiff not significantly limited in any other work-related area. Dr. Roman concluded that "with treatment," Plaintiff retained the capacity for routine work.

Plaintiff's application for benefits was denied at the Initial Level on March 20, 1997.

On April 29, 1997, Dr. Corder described Plaintiff as "really generally no better," despite not suffering any bad panic attacks. Plaintiff described amnesia-like symptoms and could not remember reading his computer books. He also indicated his vision was blurred. Dr. Corder noted that neurology and ophthalmology had already evaluated Plaintiff and cleared these symptoms. He opined that Plaintiff' problems were related more to panic than stress-related disorder.

Plaintiff presented to Dr. Afwat Attia, M.D. for the first time on May 19, 1997. Plaintiff's chief complaint was "I think something happened to my brain." Dr. Attia completed a psychiatric evaluation of Plaintiff. Upon mental status examination, Plaintiff was unkempt and his hair was uncombed. He was noted to appear anxious. He showed no involuntary movement. He tended to

elaborate on his symptoms and complaints. His speech was clear with no articulation problems. There was no evidence of suicidal ideation, delusional thoughts or hallucinations. Dr. Attia found Plaintiff was "preoccupied with his financial problems, and his inability to work." He noted that despite Plaintiff's complaints about his memory, he was able to give many details and was able to recall two out of three words after a few minutes. He also noted that despite his complaints about an inability to concentrate, Plaintiff was able to do serial sevens with no problem. He also found Plaintiff had a fair fund of knowledge, fair abstract thinking, and fair judgment.

Dr. Attia assessed "panic disorder without agoraphobia" and "rule out mood changes due to general medical condition." He found Plaintiff had the moderate psycho social stressor of "financial strain," and assessed his GAF as 50.[3]

Plaintiff filed his Request for Reconsideration four days later, on May 23, 1997.

On June 2, 1997, Dr. Attia noted Plaintiff was rather calmer compared to his first visit. He continued to complain about his poor memory interfering with his ability to work. He reported feeling better since the last week, however, and he was able to do some work around the house. Dr. Attia opined Plaintiff was showing some improvements, but sleep continued to be a problem. He increased his Vistaril and started him on Trazadone.

On June 4, 1997, Plaintiff stated he was "doing well." He reported that he was seeing Dr. King, and was doing well on new medications. He was also seeing an eye doctor for "trouble with depth perception and seeing multiple at times." Otherwise he had no complaints.

---

[3] A GAF of 41-50 indicates **Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

There is no indication that Plaintiff entered the inpatient VA program as scheduled on June 23, 1997 (R. 307).

Plaintiff's Request for Reconsideration was denied on June 24, 1997.

Plaintiff underwent a neuropsychological evaluation on June 29, 1997, performed by Martin L. Boone, Ph.D. Plaintiff told Dr. Boone he could no longer remember anything he learned in school, anything about his childhood, or anything about his children's childhoods. He reported he did not remember what doctors he had been to over the past year or any procedures done in the doctors' offices. Dr. Boone, then noted, however:

> Curiously, he was able to describe what happened in one psychologist's office with fairly good detail. He was able to remember the type of test he was given and even remembered some of the test items.

Dr. Boone noted that, despite Plaintiff's claims of difficulty following instructions and maintaining concentration, he had been able to follow a detailed map from a different city to his appointment. He noted that, throughout the evaluation, Plaintiff "tended to call the attention of the examiner to examples of his cognitive disabilities." For example, he suggested to the doctor that he was late from lunch because he could not keep track of the time, and forgot about the evaluation. Dr. Boone also reported Plaintiff had "somewhat hysterical reactions to test protocols." His affect was broad and appropriate. There was no evidence of psychosis. No mood disturbance was apparent. Dr. Boone did, however, note that Plaintiff had "rather remarkable anxiety" and his symptoms were consistent with panic disorder. Dr. Boone opined:

> In general, Mr. Devine's effort on this evaluation was highly suspect. For example, on a test instrument specifically designed to detect instances of intentionally exaggerated memory problems, Mr. Devine's memory performance was at chance levels. It is also important to note that a much more extensive battery was planned for Mr. Devine but his hysterical reactions to tests precluded a more thorough evaluation. In general, these results are interpreted with extreme caution, and are

likely to represent an underestimate of his true cognitive abilities.

Dr. Boone also found Plaintiff's complex visual analysis was within normal limits, despite Plaintiff's complaints of vision problems. His visual motor analysis and synthesis were within normal limits. Plaintiff's speech was fluent and free of errors. Plaintiff's performance was within normal limits, despite his report that he was unable to remember the meanings of many of the words.

Plaintiff's basic concentration and attention were within normal limits. While he demonstrated some lapses in his attention, Dr. Boone noted it was difficult to know how to interpret that variability given the suspiciousness of his effort.

On one memory test, Plaintiff's performance was unremarkable, but there were "some unusual patterns in his memory." Dr. Boone opined his was a "highly unusual pattern [] suggestive of deliberate attempts to exaggerate cognitive symptomology." Plaintiff insisted he had done poorly, while the actual results were within normal limits. He exhibited excellent retention of information.

Dr. Boone concluded that the test results were "difficult to interpret. He wrote:

Specifically, it was clear the Mr. Devine was not devoting his best effort to many of these tasks, in fact there is evidence of deliberate exaggeration of cognitive symptomology. On the other hand, it seems clear that Mr. Devine is experiencing a rather significant anxiety problem. Specifically, symptoms appear to be consistent with panic attacks. It appears that Mr. Devine is experiencing full blown panic attacks along with limited symptoms attacks. It is possible that his heightened arousal and anxiety levels are having an impact on his cognitive abilities. However, given his rather hysterical approach to the tasks and his general test taking attitude, it is difficult to accurately assess any possible cognitive impairments. Moreover, despite complaints of rather severe memory deficits, Mr. Devine performed within normal limits on some memory procedures. It appears that the best path to take at this point would be to treat Mr. Devine's anxiety.

On June 30, 1997, Dr. Attia noted Plaintiff was fairly groomed and dressed with a neutral affect. He had some difficulty for a few days following the reduction of Paxil. Plaintiff reported he was "getting adjusted to his difficulty and able to work within his limits." He was still getting

frustrated over the decrease in his working abilities, however. Plaintiff denied recurrence of panic symptoms. Dr. Attia opined Plaintiff was showing some improvement.

On July 14, 1997, Dr. Attia noted that Plaintiff was again fairly dressed and groomed. He denied the recurrence of any anxiety symptoms and reported feeling well adjusted to the decrease in Paxil. Plaintiff told Dr. Attia the VA told him to enter their PTSD, but "the patient stated that he did not need this service and feels fine." Dr. Attia found Plaintiff "fairly stable."

On July 16, 1997, two days later, Plaintiff called the VA PTSD Clinic and reported he could not attend the PTSD outpatient treatment as scheduled, because Dr. Attia said he was not ready to enter a PTSD treatment program and it would be a while before he will release him to do so. Plaintiff was to notify the VA PTSD Clinic when Dr. Attia "released him" for PTSD treatment (R. 307).

On July 21, 1997, Plaintiff filed his Request for Hearing.

On August 11, 1997, Dr. Attia noted Plaintiff was fairly dressed and groomed. He had a bright affect. He reported feeling better on Buspar, but was concerned about his children. Dr. Attia assessed Plaintiff as fairly stable, and responding fairly to Buspar.

Two weeks later, Plaintiff told Dr. Attia he was having recurring nightmares that interfered with his sleep. He was also concerned about his children and was having difficulty "accepting their choices." He continued to complain about poor memory that interfered with his ability to work. He denied any panic attacks. Dr. Attia encouraged Plaintiff to use his skills as best he could.

On September 8, 1997, Plaintiff informed Dr. Attia he had stopped all his medications on his own, because he had reached the point of not knowing what he would be like without them. Since stopping his medications, he reported increased anxiety, deterioration in his concentration and

increased difficulty sleeping. Dr. Attia told Plaintiff his stopping his medications was not safe and could lead to more problems. Plaintiff told Dr. Attia he was treated in the past with Ativan and it helped him, but his doctor stopped prescribing it because of the fear of addiction. Dr. Attia started Plaintiff on Ativan.

Two weeks later, Plaintiff told Dr. Attia the Ativan helped him. His affect was bright. He continued to complain of his memory and inability to work to his full capacity. Dr. Attia opined Plaintiff was showing improvement.

On September 29, 1997, Plaintiff presented to Dr. Attia, with complaints of continued difficulty sleeping. He was somewhat calmer, however. Plaintiff discussed issues related to his experience in the Vietnam war, including recurrent distressing memories. He stated these disturbing memories had been interfering with his life activities. Dr. Attia noted Plaintiff had several symptoms suggestive of PTSD as he "was struggling trying to understand people's behavior during the war time." Dr. Attia found Plaintiff was showing mild response to medication.

On October 6, 1997, Plaintiff had a bright affect. He reported feeling calmer but expressed recurrent memories of his experience with the war. He also discussed his relationship with one of his daughters who had falsely accused him of "wrongdoing." He expressed some feelings of depression and some helplessness regarding his condition. Dr. Attia found Plaintiff was showing some improvement, although he continued to have depressive symptoms and symptoms of PTSD.

Two weeks later Plaintiff told Dr. Attia he was feeling calmer. He reported feeling less depressed and less intense memories from the past. He had less sleep problems and nightmares. Dr. Attia continued to note some improvement.

On November 3, 1997, Plaintiff had a brighter affect. He denied any side effects of his

medications. He felt better and had "moments" of happiness. He did discuss his difficulty in providing for his family. He expressed difficulty interacting with some of his customers. He was again encouraged to use his skills as much as possible. He was noted to be showing improvement.

On December 8, 1997, Plaintiff had an anxious affect, but denied symptoms of depression and reported some improvement in his sleep. He expressed concern about his memory and the decline in his mental functioning. Dr. Attia continued to note improvement.

Two weeks later, Plaintiff had a full range, appropriate affect. He reported his medications were helpful, and he denied any side effects. He discussed conflicts with his wife. He continued to complain about his inability to work. Dr. Attia continued to advise him to make efforts to maintain his working skills. He continued to note improvement.

On January 5, 1998, Plaintiff had a brighter affect. He reported feeling better and able to work more. He continued to complain that he could not do as much as he used to do or would like to do. He also complained of distorted eyesight. Although Dr. Attia told Plaintiff the vison problems could be related to his emotional problems, he also noted that Plaintiff appeared to be seeing well and could read fine print during the office visit.

On January 14, 1998, Plaintiff reported some improvement in his ability to work, but continued to complain about changes in his eyesight that interfered with his work. Dr. Attia noted Plaintiff continued to improve.

On February 5, 1998, Plaintiff continued to complain of his difficulty working and providing for his family.

Two weeks later, Plaintiff had an anxious affect. He reported distortion in his vision during work. Dr. Attia advised him he needed to take breaks during work.

On March 5, 1998, Plaintiff continued to report symptoms of PTSD but denied any panic attacks.

On March 19, 1998, Plaintiff discussed his interactions with his family with Dr. Attia. He reported feeling pressured by his family to work and provide for them. He described visual changes when he was tired. Dr. Attia noted Plaintiff continued to present with psychiatric symptoms influenced by his high expectations of himself.

On March 26, 1998, Dr. Attia noted Plaintiff continued to present with anxiety and somatic symptoms.

SSA notified Plaintiff on March 26, 1998, of his Administrative Hearing, scheduled for April 24, 1998.

On April 6, 1998, Dr. Attia noted Plaintiff had an anxious affect. Plaintiff reported side effects from his Risperadol, so he discontinued it. He continued to express his concern about his psychological and physical complaints.

In a letter dated April 23, 1998, Dr. Attia advised he did not recommend that Plaintiff attend a PTSD clinic at the time given his high suggestibility. He indicated that if Plaintiff was exposed to other patients' symptoms, it might have a negative impact on him.

Administrative Law Judge ("ALJ") Frederick Moncrieff issued an unfavorable decision on July 31, 1998. Plaintiff filed a Request for Review with the Appeals Council.

In August 1998, Plaintiff reported continued memory problems, and being unable to finish projects at home. Dr. Attia noted there was not much change in Plaintiff's condition.

In September 1998, Plaintiff had a neutral affect. He reported taking his medication as prescribed. He denied side effects but noticed no change in his general work performance. He

reported continued difficulty finishing his work. He discussed his negative war experience and how much it affected his current daily life. Dr. Attia noted Plaintiff was not showing much improvement.

In October 1998, Plaintiff appeared calmer and reported improvement in his sleep. He denied anxiety or depressive symptoms. He did, however, report unusual body sensations that Dr. Attia considered delusional. He reported he had had them before but "never brought them up in previous visits." He expressed difficulty with his thinking and being unable to concentrate. Dr. Attia noted that Plaintiff "present[ed] with psychotic symptoms."

On February 1, 1999, Plaintiff presented to Dr. Attia, having stopped his medications on his own. He had not been sleeping well since then. Plaintiff said he was tired of taking the medication. But he reported becoming depressed and unable to sleep. He reported continued problems finishing projects he started. Dr. Attia noted Plaintiff was showing relapse due to non-compliance with treatment.

In March 1999, Plaintiff had an anxious affect. He was again taking his medication, and reported it was helpful to a limited degree. He also denied any side effects. He reported being absent-minded, and that it affected his ability to work. Dr. Attia advised him to pursue rehabilitation.

In April 1999, Plaintiff had a neutral affect. He was not showing much improvement despite taking his medications. He continued to express difficulty with work.

A psychological evaluation was performed at the VA hospital on September 24, 1999. The evaluator, Dr. Cameron Forfar, Ph.D., noted that Plaintiff had had a neuropsychological examination, but planned personality testing had not been pursued because of his "unusual behavior presentation." Plaintiff told Dr. Forfar he did not remember having the neuropsychological screening. Plaintiff was

disheveled with dirty jeans and hair. Dr. Forfar found his behavior remarkable "for what appeared to be an exaggerated loss of concentration." His motor coordination was poor, and he had trouble just grasping a pen and signing his name, although this had never been noted before. He made unusual chewing movements and grimacing expressions.

Plaintiff told Dr. Forfar he did not remember where he had been in Vietnam or whether he served in combat or not. Dr. Forfar, a VA psychologist, commented that this was a highly unlikely response. He also noted Plaintiff's test results were internally inconsistent and were inconsistent with results of the neuropsychological evaluation. He was oriented to place, but not year, month, day or date. When asked to draw a design from memory, his performance was "quite poor," in contrast to Dr. Boone's report which showed his visual/motor skills were unimpaired. He obtained two scores in the reasoning sub-scales, one in the average range, and one in the severely impaired range, which Dr. Forfar indicated was "again a questionable finding."

Dr. Forfar noted that some examiners suggested Plaintiff had a panic disorder. During his examination, however, Plaintiff did not describe symptoms of panic or even high levels of anxiety. He did not even appear to be particularly anxious. Instead, Dr. Forfar found his presentation was lethargic and evasive. No evidence of PTSD was sought or offered. Plaintiff's report that he could not remember if he had been in combat was "highly questionable." Dr. Forfar stated that Plaintiff had an unusual presentation and inconsistent test results, most similar to individuals with borderline intellectual functioning or severe organic brain damage, but then noted there was no evidence of either condition. He did opine that Plaintiff was "clearly distressed about financial problems."

Under Axis I, Dr. Forfar diagnosed only "rule out V65.2."[4] Under Axis II he diagnosed personality disorder, not otherwise specified. He assessed Plaintiff's GAF as in the 60-70[5] range. He noted, however, that it was difficult to determine the current GAF due to Plaintiff's "performance."

The Appeals Council granted Plaintiff's Request for Review on January 6, 2000, remanding the case back to the Administrative Law Judge with directions to complete a Psychiatric Review Technique and obtain evidence from a Vocational Expert. Plaintiff was to be offered an opportunity for a new hearing.

Plaintiff presented to Sylvia Green, M.D., another VA staff psychiatrist, on April 27, 2000, appearing very agitated, anxious, paranoid and quite fearful. He needed to have the door open, and frequently paced or stood outside the door. His wife reported he now lived by himself in the basement and did not visit with his family upstairs. Dr. Green indicated that Plaintiff appeared agitated, anxious, and fearful He said he had been previously treated by a private physician but was returning to the VA because he had lost his medical card and was unable to afford private treatment. Dr. Green opined Plaintiff's behavior was suggestive of obsessive/compulsive thoughts. In addition,

---

[4]V65.2 is the official code for "Malingering." As defined in DSM-IV:
The essential feature of Malingering is the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as avoiding military duty, avoiding work, obtaining financial compensation, evading criminal prosecution, or obtaining drugs. Diagnostic and Statistical Manual of Mental Disorders (4th ed.1994) ("DSM-IV").

[5]A GAF of 61 to 70 indicates **Some mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships.** Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

she was concerned about a possible organic component, with symptoms of cluster headaches and past visual disturbance.

Dr. Green initially recommended Plaintiff be hospitalized, but he declined. She noted that although he was markedly troubled, there was no obvious imminent danger to himself or others. Dr. Green believed additional neurologic/medical evaluation was necessary, and that Plaintiff's medications needed to be adjusted.

That same day, Plaintiff was seen by a social worker at the VA. Plaintiff's behavior and symptoms were consistent with his presentation to Dr. Green.

On May 5, 2000, Plaintiff told Dr. Green he was feeling better than at his last visit. His presentation was less anxious and agitated, but behavioral and cognitive changes were more obvious. Dr. Green found Plaintiff had little ability to give information and was unable to answer most questions due to confusion and memory problems. His behavior was at times silly and childlike. He made exaggerated and clumsy gestures with his arms, grimaced in pain, and clutched his head. Upon mental status examination, Plaintiff was oriented to person and could name the year and season, but not the month, date, or day. He could not perform serial sevens.

Upon neurological examination, Plaintiff's gait was somewhat ataxic, and he held onto the wall to do heel/toe walking. Dr. Green's assessment was that a diagnosis was still uncertain, but she believed Plaintiff's symptoms might be due to an "organic process." She thought this might involve frontal lobe involvement, perhaps a tumor or degenerative process. She also commented, however, that "it is also possible that this could be greatly exaggerated by the patient in an attempt to appear as crazy as possible, but I do not feel that this is a strong possibility." By the end of the meeting, Plaintiff had become irritable and sad, asking "what's the point?" when further work-ups

were suggested. He got up abruptly and left.

A psychological assessment performed on May 11, 2000, by Ralph Van Atta Ph.D., indicated a frontal lobe pathology. Plaintiff could not do serial sevens, and recited the alphabet in a "sing-song" manner. He failed at drawing a cube and a clock correctly. Plaintiff became increasingly anxious when tasks involving visual functions were assigned, complaining that his near vision was distorted, not simply blurred.

Dr. Van Atta opined that the data suggested a frontal lobe pathology. He noted there might be an overlay of psychosis, but commented that Plaintiff was a "difficult patient," so the diagnosis was "tenuous." Dr. Van Atta also opined that many of Plaintiff's problems appeared chronic and he considered the possibility of combat or war zone induced psychosis rather than PTSD. Exploring this possibility with Plaintiff, Plaintiff became "became quite lucid, quite focused." As stated by Dr. Van Atta:

> He provided what impressed as [a] very clear memory of a psychotic interlude involving a man wearing a silver cross (probably a chaplain) and a deceased friend. His account of his interaction with the man w/ a silver cross (he did not recognize the man as a chaplain) was quite odd and obviously psychotic.

Plaintiff next presented to the VA Mental Hygiene Clinic on August 4, 2000, seeing psychiatrist Wittawat Kasyapanand, M.D. The doctor diagnosed Plaintiff as "psychotic not otherwise specified," or "bipolar not otherwise specified." He added antipsychotic medication to Plaintiff's prescriptions, and recommended he be hospitalized, but Plaintiff resisted that idea.

On August 14, 2000, Plaintiff told Dr. Attia he was taking his medication as prescribed, and it was not causing any side effects. He had an anxious affect and reported he did not feel much difference in his condition. He expressed his concern over his treatment at the VA hospital, stating that his treating doctors kept changing frequently and he was uncomfortable with those changes. He

was also uncomfortable about the "drastic" changes the VA doctors were trying to make in his medications. He therefore did not take the new medication recommended by the latest VA doctor. He stated, however, that he had to continue treating at the VA in order to keep his benefits. Dr. Attia advised him to continue his current medications, "as he had shown the best response to it." Dr. Attia opined Plaintiff was showing some response to his treatment, but he was concerned about inconsistencies in his treatment at the VA hospital.

On September 14, 2000, Plaintiff presented to Dr. Attia with a "sad, angry affect." He said he had been taking his medication less than prescribed because he could not get the prescription filled and was therefore "trying to make it last longer." He expressed his frustration at the doctors at the VA who were trying to change his medication. He stated he didn't care anymore. Dr. Attia discussed the seriousness of Plaintiff's condition with Plaintiff's mother, who had accompanied him to the appointment. Dr. Attia was concerned about Plaintiff "due to poor compliance with treatment."

Plaintiff must show he was disabled on or before September 30, 2000, in order to be entitled to DIB. There is no such deadline for entitlement to SSI, however.

On October 16, 2000, Plaintiff told Dr. Attia he had not been taking his medication, and reported that he felt "others might benefit from the medicine" more. He reported having difficulty getting the services he needed from the VA hospital, and reported continued difficulty with both physical and emotional symptoms. His affect was anxious. He said he did not have much hope of returning back to the way he was. Dr. Attia opined Plaintiff was showing some deterioration in his condition due to his noncompliance with treatment.

On November 30, 2000, Dr. Kasyapanand reported Plaintiff presented with restricted affect

and depressed mood, and reported seeing things that were not there (R. 405). The report indicated Plaintiff seemed to have an improved mood, but that he still might benefit from anti-psychotic medications.

On January 1, 2001, Plaintiff reported to Dr. Attia that he was again taking his medication, "when his wife offered it to him." He continued to complain of several difficulties related to his war experience and reported continued efforts to get some work to support his family. Dr. Attia did not note much change in Plaintiff's emotional condition.

Plaintiff was next seen at the VA by staff psychiatrist Dr. Almond on February 9, 2001. Upon mental status examination, Plaintiff was "staring," "guarded," and soft-spoken. He had suicidal ideation without plan, and, although he was not homicidal, he expressed little tolerance for "whining," implying he could be violent. He also appeared paranoid. Dr. Almond's impression was PTSD, delayed and chronic.

Plaintiff saw Dr. Attia on February 12, 2001, again reporting he was taking his medication as prescribed. He reported it was helpful, and he felt well "some days." Over the past month, he had had ten good days. He continued to experience memories from the war and nightmares. Dr. Attia felt Plaintiff was showing some response to treatment.

Plaintiff saw Dr. Almond on March 15, 2001, stating that he could not stand to recall Vietnam, but it was on his mind constantly. Plaintiff's wife reported that he had tried to fix an electronic device recently, and spent 16 hours on it before others had to tell him to stop. She said the device was old and probably could not have been repaired anyway. Dr. Almond commented that Plaintiff had trouble with rules – apparently he had wanted to go into a restricted area at the dental clinic. He was described as adolescent-like. Plaintiff wanted to stop all his medications, but was

advised against it. He again refused hospitalization, which was again recommended by Dr. Almond.

Plaintiff saw Dr. Attia on April 26, 2001, again reporting taking his medication as prescribed. He reported that he had been going to the VA hospital for treatment. He reported no change in his mental condition, continuing to have problems with memories of his war experiences. Dr. Attia felt Plaintiff was showing partial response to his treatment.

Dr. Almond saw Plaintiff on June 5, 2001. Plaintiff regretted not having gone to the hospital when it was last recommended. He denied suicidal or homicidal ideation, but indicated he wanted to live in the woods by himself. Dr. Almond advised admission to the hospital at that time, but Plaintiff indicated he wanted to be home with his children in the summer. At the same time, however, he indicated his children suffered because of his illness.

In an addendum to his office notes of June 5, 2001, Dr. Almond wrote that Plaintiff appeared so volatile that he discussed his care with another physician. Although there was no concrete evidence that Plaintiff was going to harm himself or others, Dr. Almond believed he was chronically depressed, and predicted he had the potential to act out harmfully.

Dr. Almond saw Plaintiff again on July 11, 2001. During the interview, he discussed a vivid memory of his wartime experiences. He feared admission to the hospital as "like being locked up." Dr. Almond did note there was some progress in improving Plaintiff's mental status.

Plaintiff returned to Dr. Attia in September 2001, after a five month absence. During that period of time, Plaintiff had been treated at the VA hospital, which treatment apparently did not include therapy. Dr. Attia noted the interruption in Plaintiff's treatment led to some deterioration in his condition. Plaintiff reported being disappointed with his treatment at the VA hospital, and felt he did not have a good chance of getting the therapy he needed and was not comfortable with the

medication changes they made. He discussed issues related to his war experiences, and noted they continued to affect his feelings and reactions. Plaintiff's wife also reported he was not doing well without therapy. Dr. Attia noted Plaintiff's treatment had been interrupted, leading to some deterioration in his condition.

On September 20, 2001, SSA sent Plaintiff a notice of Administrative Hearing scheduled for October 30, 2001.

Dr. Attia completed a "Medical Assessment of Ability to do Work Related Activities (Mental)" on September 25, 2001. He opined that Plaintiff had no useful ability in the areas of: understanding, remembering, and carrying out simple job instructions; following work rules; relating to co-workers; dealing with the public; using judgment; dealing with work stresses; functioning independently; and maintaining attention and concentration. His ability to interact with supervisors was seriously limited but not precluded. He had poor or no ability to behave in an emotionally stable manner; relate predictably in social situations; and demonstrate reliability. His ability to maintain his personal appearance was seriously limited. Dr. Attia opined Plaintiff was suffering from multiple psychiatric symptoms that interfered with his memory and attention and would interfere with his ability to deal with stress and the public. He also noted that psychological testing showed significant disturbances suggestive of dementia. He also opined Plaintiff's memory and comprehension were affected and that his past experiences interfered with his thought processes, making followup on treatment and work difficult.

On October 3, 2001, Dr. Attia wrote that Plaintiff was first seen in his office in May 1997. He diagnosed him with panic disorder without agoraphobia and mood changes due to his general medical condition. He noted that after several visits, Plaintiff began showing symptoms of PTSD

and dysthymia. He noted there had been very little improvement in Plaintiff's condition since that time.

During the Administrative Hearing on October 30, 2001, Plaintiff denied any specific recollection of having received a bachelor's degree in business and engineering. He testified he could not recall whether he had engaged in any other post college studies. He did recall selling computers, being the owner of an alternative energy store, and teaching computers, but could not recall the dates of employment. He was unable to recall any employment in the past fifteen years. He remembered that he served in the military, but could not recall the dates of service. He recalled serving in Vietnam, but could not recall anything specific about his tour of duty. He testified, however, that he had received the bronze star, Vietnam cross, and gallantry award.

The ALJ asked the VE to identify jobs a hypothetical individual of Plaintiff's age, and education and work experience could perform with the following limitations: the individual could understand, remember, and carry out simple instructions, could relate to co-workers and supervisors, and could perform simple, repetitive tasks. He should work at his own station, and work with objects rather than people. The VE testified that such an individual could perform work which existed in significant numbers in the national economy.

The undersigned United States Magistrate Judge recommended the ALJ's decision be reversed and remanded for three reasons: 1) substantial evidence did not support the ALJ's outright rejection of Dr. Attia's opinion or his reliance on the State agency psychologists' opinions; 2) substantial evidence did not support the ALJ's determination that Plaintiff's only mental impairments were "malingering and possible anxiety or somatization disorder," and therefore did not support his credibility finding; and 3) substantial evidence did not support the ALJ's reliance on

hypotheticals to the VE, because of his unsupported outright rejection of Dr. Attia's opinion. Neither party objected to the undersigned's Report and Recommendation or appealed the Order of the District Court.

On February 11, 2005, the Appeals Council vacated the final decision of the Commissioner and remanded the case to a different ALJ for further proceedings consistent with the order of the court. The Appeals Council directed the ALJ to offer Plaintiff the opportunity for a hearing, take any further action needed to complete the administrative record, and issue a new decision (R. 551).

**Evidence Submitted Subsequent to the First Report and Recommendation**

On September 28, 2001, Plaintiff presented to VA staff psychiatrist Greenbrier Almond, for followup of his PTSD (R. 756). Plaintiff reported he was still unable to cope effectively; repaired computers and had good days and bad days; and obsessed if he could not repair something. He stated that 9/11 changed everything, and that his children felt safe with him. He felt out of control on Gabapentin[6] and cut the dose in half. He also reported altered awareness and function and severe headaches with wavy vision. He said he felt "crazy," and isolated himself as a way to cope. Dr. Almond diagnosed PTSD with questionable vascular problems and migraine variation.

On October 12, 2001, Dr. Attia met with Plaintiff and his wife (R. 636). Plaintiff reported he took his medications when offered by his wife. His medications had been changed repeatedly by the VA doctor, and he was not comfortable with that. He said that at times he was in a good mood and was able to get some work done, but at other times, could not do much. He spent a lot of time by himself, having difficulty interacting with others. Plaintiff's wife reported that he got lost at

---

[6]An anticonvulsant that is used as adjunctive therapy in the treatment of partial seizures. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 764(30th ed. 2003).

times, but was able to ask for help and find his way.

Dr. Attia's diagnosis was "The patient continues to present with symptoms suggestive of PTSD." He opined that Plaintiff was showing moderate response to treatment, but the lack of integration between medical, psychological and social treatment was slowing his improvement.

The Administrative Law Judge entered his Decision finding Plaintiff not disabled on November 27, 2001.

On December 13, 2001, Plaintiff presented to VA staff physician Sidney Jackson for follow up of a cyst and high cholesterol (R. 754). He said he was not having a major problem. He was not taking his simvastatin for cholesterol, but was following up with Mental Health regularly. He stated he felt that he was "just not good enough and that Christ would not even want him." He asked some questions regarding this and the doctor assured him he was acceptable.

On December 28, 2001, Plaintiff presented to Dr. Almond for follow up of his PTSD (R. 753). Plaintiff was asked to describe his combat trauma. He was concerned that he did not get a "good evaluation" on his C&P [Compensation and Pension[7]] examination, but still did not describe the trauma. He took his medications only sporadically. He said he did not trust they were the right

---

[7]Compensation:
VA can pay you monthly compensation if you are at least 10% disabled as a result of your military service.

Pension:
You can receive a monthly pension if you are a wartime veteran with limited income, and you are permanently and totally disabled or at least 65 years old.
. . . .
You cannot receive a VA non-service connected pension and service-connected compensation at the same time. However, if you apply for pension and are awarded payments, VA will pay you whichever benefit is the greater amount.

United States Department of Veterans Affairs website: www.vba.va.gov

medications, but felt they were helpful. He admitted hopelessness but denied homicidal or suicidal ideation. Dr. Almond assessed Plaintiff's GAF at 45.[8]

On January 14, 2002, it was noted that Plaintiff's Clonazepam had expired but he took it only sporadically (R. 752). He had last taken it in October 2001.

Plaintiff filed his Request for Review with the Appeals Council on January 24, 2002. The Appeals Council denied Plaintiff's Request for Review on April 5, 2002, and Plaintiff filed his first Complaint in this Court on May 8, 2002.

On July 18, 2002, Dr. Almond noted that Plaintiff complained of panic, but he was not taking his Gavapentin or Olanzapine[9] as prescribed, but rather on an as-needed basis (R. 751).

On July 30, 2002, Plaintiff followed up with his VA physician, Dr. Jackson, for his physical problems (R. 748). He was recently started on atenolol for anxiety and panic attacks, and "it has helped quite a bit." He was not having as much of a problem with that. The doctor diagnosed mild cervical arthritis, GERD, anxiety, high cholesterol, and a healed cyst.

Plaintiff followed up with VA psychologist Almond on October 25, 2002 (R. 748). The focus of his complaints were somatic, which were referred to the doctors. He complained of anger outbursts and inability to focus on tasks, partly improved with Gabapentin. He complained of sleep disturbance and paradoxical excitement with Olanzapine, which was being changed. He was not

---

[8]A GAF of 41-50 indicates **Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

[9]A monoaminergic agent used as an anti-psychotic in the management of schizophrenia and for short-term treatment of manic episodes of bipolar disorder. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 1336 (30th ed. 2003).

suicidal or homicidal and had a non-psychotic level of disturbance. Dr. Almond advised more psychotherapy but Plaintiff declined. The diagnosis was: "Troubled man w/PTSD and co-morbidities" and a GAF of 45.

On January 9, 2003, Plaintiff followed up with VA physician Ron Pelligrino, M.D. (R. 744). His primary complaints were of recurrent anxiety. He was uncertain whether he was doing better or worse. He had difficulty focusing on problems. He denied suicidal or homicidal ideation, but said he continued to have feelings of helplessness and worthlessness. The atenolol[10] was helping with his anxiety attacks, and his GERD symptoms were also helped with medication.

On January 24, 2003, Plaintiff presented to Dr. Jackson with complaints of pain in his right hip, radiating down all the way to his right big toe (R. 741). Dr. Jackson diagnosed sciatica. By January 31, he was doing better, although still having some discomfort (R. 740). The doctor diagnosed acute sciatica, improved. Plaintiff's anxiety was stable.

On January 31, 2003, Plaintiff presented to Dr. Almond for follow up of his PTSD (R. 739). Plaintiff told Dr. Almond that he was concerned that there may have been "inconsistencies" in his C&P examination. He was now isolating in his basement and was "no use" to his family. Plaintiff said he was "giving up," but did not have suicidal or homicidal ideation. Dr. Almond noted he was functioning with delusions and fixed beliefs, and diagnosed PTSD with psychotic features, with a GAF of 41. Dr. Almond recommended a Vet Center group and discussed PRRP (Post-Traumatic Stress Residential Rehabilitation Program). There is no evidence Plaintiff ever attended either.

On March 17, 2003, Plaintiff presented to physical therapy for his back problems (R. 737).

---

[10]A cardioselective agent used in the treatment of hypertension and chronic angina pectoris and the prophylaxis and treatment of myocardial infarction and cardiac arrhythmias. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 174 (30th ed. 2003).

On July 7, 2003, Plaintiff presented to Dr. Almond for follow up of his PTSD (R. 735). Plaintiff said he was still distressed at the misinformation given on his C&P, but would not file for a correction, saying, "Maybe they are right; I never can fight the system." He appeared distressed but limited himself. His GAF was assessed at 45. The doctor encouraged him to go to the Vet Center group, but Plaintiff again resisted.

On August 14, 2003, Plaintiff presented to Dr. Jackson for follow up of his high cholesterol, high blood pressure, and "PTSD with psychosis" (R. 733). He was diagnosed with "some degenerative arthritis, possible radiculopathy," and diarrhea of unknown etiology. His blood pressure and GERD were well-controlled.

On November 12, 2003, Plaintiff presented to Dr. Almond for follow up of his PTSD (R. 715). He complained of getting angry more and more, apologizing to his wife, children and "to god." He said he was angry recently and "took a gun after a repair person." He was stopping his medications on his own whenever he felt he had "too many." He was not able to do one-on-one with the Vet Center any more. He was not suicidal or homicidal, but had a delusional quality with mistrust of the system. He was assessed as a GAF or 42 "and faltering." The doctor noted that after his recent C&P exam, Plaintiff's pension was cut from 60% to 10% service connected for PTSD.

An optometry note from February 17, 2004, indicated that Plaintiff's "subjective complaints are much greater than any clinical signs." The doctor did, however, relate that the symptoms may have been related to mental health issues.

On February 23, 2004, Dr. Almond found Plaintiff had made no progress with his mental impairments (R. 705). He noted that Plaintiff lived with fear and anxiety, berated himself constantly, and seemed not be to able to set an agenda.

On April 21, 2004, Plaintiff presented to VA psychologist Bartsch for individual therapy upon referral by Dr. Almond (R. 703). Plaintiff was most concerned about financial problems, reporting that he lost his non-service-connected pension when his wife received some insurance money. He had been rated at 60% for PTSD. The pension was larger than his service-connected PTSD amount, so he was receiving the pension until it was cut off due to income. After his last C&P examination, however, his service- connected compensation for PTSD was reduced to 10%. The family was now unable to pay bills and the children could not get medical coverage. Dr. Bartsch noted: "It appears that the veteran's unusual mental state (fragmented memories, possible dissociative episodes, humor that distracts from the task at hand) may have contributed to his reduced service-connected percentage."

Plaintiff's wife told Dr. Bartsch that Plaintiff had had a high security clearance and/or was involved in covert operations. Plaintiff said he had worked in a variety of capacities in Vietnam because his MOS was not needed in the unit where he was assigned. His wife said he had had nightmares ever since Vietnam. He was a successful computer repair person until about seven years earlier when he "dissociated," telling his wife he "had no control of his body."[11]

Plaintiff presented in no acute distress, and his wife identified no acute problems. He was evasive about war experiences, reporting having poor memory for pre and post military as well as his time in Vietnam. He was not suicidal or homicidal. Financial stress was his most important problem. Dr. Bartsch's initial impression was that Plaintiff had "an atypical PTSD, possibly with amnesia and dissociative features."

---

[11]As the ALJ noted, in 1995, the last full year before Plaintiff's onset date, he reported income of $1,944.00. His highest reported total, of $7463, was reported in 1991 (R. 81).

In an addendum to his report five days later, Dr. Bartsch noted that it was determined that Plaintiff had an unremarkable military experience with no hospital admissions or indication of covert military operations (R. 704). Plaintiff had originally filed for service-connected PTSD and was denied twice for failure to describe a specific stressor. He was granted a non-service-connected pension for "PTSD, Panic disorder without agoraphobia, and somatization disorder" in August 1999. Subsequently, Plaintiff submitted a lengthy document arguing he was exposed to a number of stressors. The account was atypical compared to most stressor statements by veterans. It followed a set pattern, and quoted a written description of a war experience that another soldier had posted on a veteran's web bulletin board. Plaintiff then offered some commentary that implied he had had a comparable experience. He related one rocket attack that caused the death of two Americans, but did not address his role in the event. The examiner at the time cited that stressor and concluded that Plaintiff "probably had severe but atypical PTSD with psychogenic amnesia," but that he (the examiner) needed verification of the reported stressors. Subsequently, there was evidence found of an American killed and two wounded the day before Plaintiff had said it happened. "On the basis of this evidence, the Regional Office concluded that the patient's stressor was verified and granted a 50% service connection to the patient for PTSD.

A different C&P examiner, however, interviewed Plaintiff in 2003, and concluded that his behavior and report of symptoms was too disorganized to warrant a firm diagnosis of PTSD. His service-connected compensation was reduced to 10%. Dr. Bartsch concluded that the material did not add much clarity to the question "about whether this veteran contracted PTSD in Vietnam."

Plaintiff next presented to Dr. Bartsch on May 12, 2004, for follow-up (R. 702). They talked about his military experiences. Plaintiff was eccentric in manner, "suggestive of schizotypal traits

though he was not flat in affect. His account of his military experiences was fragmented, incomplete, and tangential." Plaintiff talked about some of his experiences, showing "strong affect and seem[ing] near tears." His affect "seemed quite genuine." He and the psychologist "also reviewed some Internet sites describing the period in Vietnam when the patient was there. There were some similarities . . . ."

Plaintiff underwent an optometry followup on June 22, 2004 (R. 697). Plaintiff had numerous complaints including "the appearance that everything is bent" and double and triple vision. He answered yes to every symptom the doctor mentioned. The optometrist concluded that Plaintiff had subjective complaints without clinical signs, noting:

> His symptoms are not consistent with any clinical signs of his eyes. He now describes his symptoms differently and did not even mention the "drifting" until I asked. Today he answers yes to every complaint I list though after repeated attempts he would not say he had this problem on his own. Again, there are no objective findings for his symptoms. These symptoms appear to be completely of psychogenic (mental health) in nature.

On July 13, 2004, Plaintiff followed up with Dr. Bartsch regarding his PTSD (R. 696). Plaintiff brought a CD with him "containing many short descriptions of events connected to the war in Vietnam." He wanted the psychologist to read the portions covering 1972 and 1973, when he was there, so he "might understand how horrible it was for him there." Plaintiff reported frequent nightmares, but was reticent to talk about trauma, implying he might be more open after the psychologist looked at the CD." He reported continued suicidal ideation with no current intent. The doctor found Plaintiff continued to be "eccentric," though less so than initially.

On August 2, 2004, Plaintiff told Dr. Bartsch about an event in Vietnam where he was driving a truck toward Saigon. Pro-American Vietnamese were clinging to the truck to reach Saigon.

One woman dropped her infant and Plaintiff ran over it. He described the incident and emotions in moderate detail, noting a passenger in the truck "made a callous comment, 'that's one point.'"[12] Plaintiff was "more organized and open in telling this story compared to the evasive and disorganized style evidenced in the past two sessions." Plaintiff brought up feelings of guilt and a feeling he was a monster due to killing the baby.

On August 17, 2004, Plaintiff followed up with Dr. Bartsch regarding his PTSD (R. 694). He reported several days of intense panic after his last session, and said he was now amnestic regarding that session. He was not going to go to his C&P exam because he was too anxious. Plaintiff talked in a disorganized way about his inability to work. He had applied for disability and was turned down. He feared he would die soon and leave his children without financial support. Plaintiff appeared more nervous, holding his chest at times. Communication was problematic. He often spoke in metaphor. The psychologist's overall impression was PTSD with dissociative features and psychogenic amnesia, rule out cognitive dysfunction related to possible stroke, and paranoid personality traits.

On August 25, 2004, Plaintiff presented to Dr. Jackson in regard to his general medical needs, including hypertension, GERD, and degenerative arthritis of the dorsal spine with spinal stenosis causing some pain in the right leg (R. 690).

On September 3, 2004, Plaintiff followed up with Dr. Almond regarding "atypical depression" (R. 688). Plaintiff reported feeling discouraged, sad, and like a burden to his family, although he was not suicidal, homicidal or psychotic. Dr. Almond assessed his GAF as 40.

---

[12]The movie "Death Race 2000," in which drivers received points for running over people, came out in 1975.

Plaintiff followed up with Dr. Bartsch on September 14, 2004 (R. 687). Plaintiff talked about "people" who might be manipulating the psychologist with the result that Plaintiff would be denied an increase in his benefits. He spoke about "people in charge manipulating pharmacy." He believed their goal was to stay in power, because if they failed "people might work to get back to the constitution or find Jesus."

Plaintiff next saw Dr. Bartsch on November 15, 2004 (R. 686). Plaintiff tried to tell a coherent story of his tour in Vietnam "for which his memory is fragmented still." He related that he was placed on stand-by status and assigned to burn the drums used for latrines in Vietnam. Later he was assigned to be a clerk but could not complete the forms correctly. There was chaos and his paperwork was misplaced. He was at loose ends. He drifted into some bad company, apparently individuals involved in the Black Market, during which Plaintiff witnessed "some horrible events that were perpetrated by these individuals." He could not specify what they were. He eventually was given a job sorting clothing coming in from departing units. He supervised a contingent of local women. This involved some convoy assignments, during one of which he ran over a baby. He also had a girlfriend who was killed by an American MP. He threatened the MP and served time. The area where he and the women worked was mortared. The women clung to him. In 1972 an ammo dump was blown up and he was near enough to be thrown 20 feet through the air. Plaintiff was visibly distressed telling these stories "most likely from memories of the atrocities he alluded to seeing."

On January 3, 2005, Plaintiff presented to Dr. Bartsch as "confused and tangential." He lost track of his train of thought and lost concentration on what was being discussed. Many of his answers were vague. He said he had violent fantasies but denied intent to harm anyone or himself.

40

Dr. Bartsch found Plaintiff's description of his post-military years was supportive of having PTSD. His description of his breakdown resembled a panic attack. He advised that Plaintiff's PTSD might be related to both black market violence and the death of the baby.

On February 7, 2005, Plaintiff presented to Dr. Bartsch, bringing in a cardboard box containing copies of letters he wrote from Vietnam, a yearbook from a unit he served in while there, copies of his files, and a photo album (R. 681).

On March 24, 2005, Plaintiff underwent a physical examination at the request of the State agency (R. 616). Plaintiff stated he was disabled due to low back pain. His medications were listed as Claritin (for allergy), Klonopin, Motrin, Flexeril (for pain), Atenolol, Lopid, Gabapentin, Omeprazole (for GERD or ulcer), and Sertraline (used to treat depressive, obsessive-compulsive, and panic disorders). The doctor summarized his findings as follows:

> The claimant is a 54-year-old male who complains of chronic low back pain. On exam, the lumbar spine was tender, but there was no decreased range of motion. Straight leg testing was negative for radiculopathy. Motor strength, sensation, and deep tendon reflexes remained normal and symmetric to both lower extremities.

The doctor found Plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand/walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday (R. 622-623). He should never kneel or crawl, occasionally climb, crouch, and stoop, and could frequently balance. He must avoid vibration, but had no other limitations.

On April 18, 2005, Plaintiff underwent a mental status exam, performed by Sharon Joseph, Ph.D., at the request of the State agency (R. 627). His chief complaints were heart problems, PTSD, and vision problems. Upon Mental Status Exam Dr. Joseph found Plaintiff was alert, oriented, and cooperative (R. 630). He was unkempt and untidy, exhibiting poor hygiene. He was dirty. He

denied appetite disturbance, but reported sleep difficulties with nightmares of Vietnam and flashbacks. His mood appeared depressed. He denied suicidal or homicidal ideation. There were no perceptual or thinking disturbances relative to the presence of hallucinations or delusions; no preoccupations, obsessions or compulsion noted. Motor activity was "nervous." Posture was appropriate; eye contact was fair; language was fair; speaking was normal; content was relevant; and conduct was cooperative. There were no psychomotor disturbances noted. Affect was somewhat labile. He "did not appear to be very happy about the interviewer going through the process of being evaluated by SSI again." Insight appeared limited. Immediate memory was within normal limits, recent memory was moderately impaired, and remote memory was within normal limits. Concentration was considered moderately impaired as reflected by performance of serial 7's. Judgment was considered within normal limits.

Plaintiff reported his activities of daily living as getting up at 8 a.m., drinking coffee, and talking to his mother on the phone. In the afternoon he took a nap and in the evening watched television. He could make the bed and go up and down stairs, but "has trouble doing a lot of things around the house." He did walk to the mailbox and drive a car. Plaintiff reported he did not go out much, spending time only with his wife and children. He liked nature, but no longer went hunting of fishing. His interaction during the interview was mildly impaired due to concentration and difficulties, and at times, difficulty answering questions. Socialization was considered mildly impaired.

Dr. Joseph found that Plaintiff's reported symptoms appeared to be consistent with PTSD (R. 631). He appeared to have recent memory and concentration issues. No testing was ordered, but information in regard to memory was based upon the mental status examination. "Apparently testing

that was attempted in the past to assess his memory has been inconclusive and not always valid."

Dr. Joseph diagnosed PTSD (per medical record), and considered his psychological prognosis "fair" (R. 631).

Dr. Joseph completed a Mental RFC, opining that Plaintiff would have a moderate restriction on his ability to understand, remember, and carry out detailed instructions; interact appropriately with the public, supervisors, and coworkers; and respond appropriately to work pressures and changes in a routine work setting (R. 633-634). He would have a slight restriction in his ability to understand, remember, and carry out short, simple instructions, and make judgments on simple work-related decisions.

On June 30, 2005, Dr. Abdel-Fatah Massoud, MD, Plaintiff's new doctor at the VA, opined in a letter to the State agency, that Plaintiff was unable to hold any gainful employment, part-time or full-time. He offered no explanation or office notes. He requested reconsideration of Plaintiff's application for benefits (R. 637).

A July 14, 2005, ECG was normal (R. 773).

On September 12, 2005, Plaintiff presented to psychologist Bartsch, for individual therapy for PTSD (R. 766). Plaintiff reported that financial burdens persisted. When asked about the pension expedited by the VA, he initially talked as though it was being withheld, then, after substantial probing, said that the money (about $1500) arrived in early September, although he claimed to be ignorant of how it was used. He was also asked about a visit from Child Protective Services, but claimed to be ignorant even of the comments he made regarding this during his last visit. The doctor stated; "It is not possible to discern how much he is actually amnestic versus merely avoiding the issues." Plaintiff said he could not afford to come in two days to see Dr. Skar.

He had refills for all his psychotropic medications, but wanted a refill of Claritin. The psychologist referred him to the clinic, but he then responded by "pointing out that HuricaneKatrina [sic] victims get better care than he does even though his life was in danger in Vietnam."

Plaintiff brought Dr. Bartsch a computer disc "containing an account of personal problems since [his] last session." It mentioned mainly a number of physical complaints and mentioned having nightmares (unspecified). The nightmares had to do with being shot in the chest and arms. Asked to relate the nightmares to Vietnam, Plaintiff "said it might be connected to the time that the ammo dump explosion blew him against the wall of sleeping quarters."

Dr. Bartsch continued as follows:

> Plaintiff continues to present as whimsical, evasive, eccentric, and disorganized. The one constant theme pertains to his financial difficulties. Patient remains 10% service-connected for PTSD. He was encouraged to file a claim for increase and use the undersigned's progress notes. He responded tangentially. When this was pointed out, he said he could not help himself.

Plaintiff responded tangentially to attempts to define therapeutic goals, reporting only that he was being torn apart by stress. He said he no longer wished to come for treatment at the VA, because it was "giving him false hope he will obtain money or other help." He said he would not come again. He was therefore discharged from the clinic.

On November 16, 2005, Plaintiff presented to VA psychiatrist Sandra Skar, M.D. for follow up of his PTSD (R. 765). In response to the question, "how are things going?" Plaintiff said "too tough a question." He sat silently for awhile. When Dr. Skar remained silent, he said, "too many panic attacks," and "that was the only part I know how to say," "nervous energy inside making it quiver inside,""sometimes I am scared to get out of bed," "bout of sciatica, it was horrible, two weeks on the crutches." Dr. Skar noted that when asked what he meant by sciatica Plaintiff gave a

fairly well organized statement, noting the color of the nerves in the illustration shown to him in a clinic were yellow, but then saying he could not remember who showed it to him.

Objectively, Dr. Skar found Plaintiff to be alert and fully oriented, mood stable, neutral, affect congruent, thoughts goal-directed, with inconsistences in memory deficits. Judgment and insight were limited and there was no suicidal or homicidal ideation. He was diagnosed with PTSD as well as depression secondary to general medical condition (sciatica).

On November 30, 2005, Plaintiff was diagnosed with "some spinal stenosis with history of sciatica" (R. 761). He was to continue stretching and walking therapy.

A November 29, 2005, lumbosacral spine series showed no evidence of fracture, spondylolysis or spondylolisthesis. It showed mild degenerative changes slightly more pronounced at L5-S1 where there was mild to moderate disc space narrowing. The radiologist referred to the findings as a "minor abnormality." (R. 769).

Effective December 1, 2005, Plaintiff was awarded a service connected disability rated 10% and nonservice pension rated 60% (R. 566). He received benefits in the amount of $1455.00.

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ made the following findings:

1.  The claimant meets the non-disability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act so as to be insured for such benefits through September 30, 2000.

2.  The claimant has not definitively engaged in substantial gainful activity during the period at issue herein, i.e., since March 31, 1996 (20 CFR §§ 404.1520(b), 404.1571 et seq., 416.920(b) and 416.971 et seq.).

3. During the period at issue, the claimant has had the following medically determinable impairments that, either individually or in combination, are "severe" and have significantly limited his ability to perform basic work activities for a period of at least 12 consecutive months: chronic low back sprain/strain, with resulting pain; degenerative arthritis of the knees; history of mitral valve prolapse, with mild regurgitation; posttraumatic stress disorder; history of anxiety disorder; and history of somatoform disorder (20 CFR §§ 404.1520(c) and 416.920(c)).

4. During the period at issue, the claimant has had no medically determinable impairments, whether considered individually or in combination, that have presented symptoms sufficient to meet or medically equal the severity criteria for any impairment listed in Appendix 1, Subpart P, Regulation No. 4 (20 CFR §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. Throughout the period at issue, the claimant has had at least the residual functional capacity to perform , within a low stress environment, a range of unskilled work activity that requires no more than a medium level of physical exertion; entails no production line type of pace, or independent decision making responsibilities; involves only routine, repetitive instructions and tasks; and requires no more than occasional interaction with other persons (20 CFR §§ 404.1520(c0 and 416.920(c)).

6. Throughout the period at issue, the claimant has lacked the ability to fully perform the requirements of his vocationally relevant past work (20 CFR §§ 404.1565 and 416.965).

7. The claimant during the period at issue is initially considered for decisional purposes as a "younger individual." Upon and after his attainment of age of 50 in June 2001, he is appropriately considered as an "individual closely approaching advanced age." Upon and since his attainment of age 55 in June 2006, he is appropriately considered as an individual of "advanced age" (20 CFR §§ 4040.1563 and 416.963).

8. The claimant has attained a four-year college education and is able to communicate in English (20 CFR §§ 404.1564 and 416.964).

9. The claimant has a skilled work background but has throughout the period at issue lacked the residual functional capacity to engage in or sustain skilled work activity on a competitive basis. Thus he has acquired no particular skills that are transferable to any job that has remained within his residual functional capacity to perform during such period (20 CFR §§ 404.1568 and

416.968).

10.    Considering the claimant's age, level of education, work experience and prescribed residual functional capacity, he has remained capable throughout the period at issue of performing jobs that exist in significant numbers within the national economy (20 CFR §§ 404.1560(c), 404.1566, 416.960(c) and 416.966).

11.    The claimant has not been under a "disability" as defined in the Social Security Act, at any time during the period at issue herein, i.e., since March 31, 1996 (20 CFR §§ 404.1520(g) and 416.920(g)).

(R. 483-501).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" Hays, 907 F.2d at 1456 (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the

47

reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1.  The ALJ failed to give sufficient weight to the opinion of Mr. Devine's treating physicians, and the resulting hypothetical to the VE is therefore improper;

2.  The ALJ failed to evaluate Mr. Devine's subjective complaints; and

3.  The Commissioner failed to effectuate the intent of this Court's Order entered 27 January 2005 remanding the claim.

The Commissioner contends:

1.  The ALJ complied with the controlling regulations in evaluating the medical source opinions;

2.  The ALJ evaluated Plaintiff's subjective complaints according to the regulations; and

3.  The ALJ complied with this Court's remand Order.

## C. Compliance with Court's Prior Order

The undersigned first addresses Plaintiff's argument: "The Commissioner failed to effectuate the intent of this Court's Order entered 27 January 2005 remanding the claim." Defendant contends the ALJ complied with this Court's remand order. In the prior order, the undersigned found that Dr. Attia was Plaintiff's treating psychiatrist and that ALJ Anderson's complete rejection of Dr. Attia's opinion regarding Plaintiff's limitations was not supported by substantial evidence. Also unsupported was ALJ Anderson's reliance on the State agency physician opinions, because those

opinions were advanced in 1997, long before most of the evidence in this case was even in existence. The undersigned found there was no support for ALJ Anderson's conclusive "finding" that Plaintiff's only mental impairments were "malingering and possible anxiety or somatization disorder," especially considering that the State agency reviewing psychologists on whom he relied, found Plaintiff did have a medically determinable anxiety disorder or somatoform disorder. Finally, the undersigned concluded that substantial evidence could not support ALJ Anderson's credibility finding or his hypothetical to the VE, solely due to his unsupported rejection of Dr. Attia's opinion and his finding that Plaintiff's only mental impairments were "malingering and possible anxiety or somatization disorder."

The undersigned did not recommend, nor did the District Judge order award of benefits. Instead, the case was remanded "for further action in accordance with the Report and Recommendation" (R. 547). The undersigned is in complete disagreement with Plaintiff's argument that: "In light of the finding that the rejection of the opinion of treating physician Dr. Attia was without the support of substantial evidence, it is difficult to understand what the Commissioner could do upon remand other than simply calculate benefits." (Plaintiff's brief at __). Upon remand, the Appeals Council vacated the previous decision and remanded the case to another Administrative Law Judge "for further proceedings consistent with the order of the court" (R. 551). The Appeals Council further directed the ALJ offer Plaintiff the opportunity for a hearing, take any further action needed to complete the administrative record, and issue a new decision.

Administrative Law Judge Alexander held a new hearing, took a great deal of new evidence, and issued a new decision. In that decision, ALJ Alexander explains in detail why he also rejected Dr. Attia's functional assessment. The undersigned finds that reasoning comports with the

evaluation of treating physician opinion evidence found in the case law and the regulations. As the Fourth Circuit stated in Craig, the ALJ is entitled to reject the treating physician's opinion "if persuasive contradictory evidence exist[ed] to rebut it."  In that regard, ALJ Alexander noted, among other evidence, Dr. Fremouw's report that Plaintiff's subjective complaints were "vague and hard to diagnose;" the VA evaluation that "yielded no diagnosis of [PTSD] because the claimant was not 'exposed to trauma in Vietnam of any intense level' and did not have any traumatic memories or recollections;" Dr. Boone's report that Plaintiff claimed to have no memory of his childhood or his children's childhood, although he was able to recall other events in great detail and could follow a detailed map to his appointment despite an assertion he could not follow directions; Dr. Boone's conclusion that Plaintiff's efforts were "highly suspect" and indicated exaggerated memory problems; Dr. Boone's finding of evidence of deliberate exaggeration of cognitive symptomatology; Dr. Boone's finding that despite Plaintiff assertion of severe memory problems, he performed within normal limits on certain memory tests; Plaintiff's detailed account of his childhood and history to Dr. Attia, then, one month later, his assertion to Dr. Boone that he could not remember his childhood and had no memory for much of anything from the past; Dr. Forfar's opinion that Plaintiff had "what appeared to be an exaggerated loss of concentration;" that Plaintiff's report that he could not remember if he had been in combat was "highly questionable;" that Plaintiff's test results were internally inconsistent and inconsistent with the earlier neuropsychological examination; and his assessed GAF of 60-70.

As opposed to ALJ Anderson's reliance on the 1997 State agency reviewing physicians' opinions, ALJ Alexander also considered a consultative evaluation, performed by Sharon Joseph in 2005, as well as numerous records from treating and examining physicians and psychologists.

Most significantly, as opposed to ALJ Anderson's unsupported finding that Plaintiff's only mental impairments were "malingering and possible anxiety or somatization disorder," ALJ Alexander found Plaintiff did have the severe mental impairment of Post Traumatic Stress Disorder, a finding that is supported by the record.

For all the above reasons, the undersigned finds that the Commissioner and ALJ Alexander did comply with this Court's order of January 2005.

## D. Disability on or before September 30, 2000

Although not expressly argued by the parties, and in light of the extended length of time and volume of evidence in this case, the undersigned believes it would be efficient at this time to consider the evidence of record in light of Plaintiff's Date Last Insured. Pursuant to 20 CFR § 404.101, Plaintiff must show he was disabled on or before September 30, 2000, to be entitled to DIB. The record, however, substantially supports the ALJ's determination, implicit in his finding of no disability since onset date, that Plaintiff was not disabled, for purposes of DIB, on or before September 30, 2000.

Plaintiff applied for benefits on December 3, 1996, alleging disability since March 31, 1996. Virtually all tests were normal. Plaintiff was diagnosed with headache, visual blurring, and paresthesias of undetermined etiology and anxiety disorder suspected in July 1996. Two weeks later, Plaintiff said the headaches were gone but he just "did not feel right." He was then diagnosed with multiple somatic complaints of unclear etiology, "probably anxiety related." At the end of July, Plaintiff stated only that he still had "some anxious moments but he trie[d] to deal with those and they [were] short lived." He was doing quite well on Ativan. On September 12, 1996, Plaintiff told Dr. Dove he was doing fairly well, despite "continuing to fluctuate as to his compliance with the

medicines that have been prescribed." On November 6, 1996, he was diagnosed with "rule out PTSD." Except for an anxious-appearing mood and affect, Plaintiff's mental status exam "remain[ed] unremarkable." In December his treating physician diagnosed him with PTSD stable with anxiety component. Dr. Afwat Attia, M.D. completed a psychiatric evaluation of Plaintiff on May 19, 1997, more than a year after his alleged onset date. Dr. Attia found Plaintiff was "preoccupied with his financial problems, and his inability to work." He noted that despite Plaintiff's complaints about his memory, he was able to give many details and was able to recall two out of three words after a few minutes. He also noted that despite his complaints about an inability to concentrate, Plaintiff was able to do serial sevens with no problem. He also found Plaintiff had a fair fund of knowledge, fair abstract thinking, and fair judgment. By January 1998, Plaintiff had continuously improved, and reported improvement in his ability to work. In February 1999, his doctor opined he had relapsed "due to noncompliance with treatment." He advised rehabilitation. In September 1999, Dr. Forfar, a VA psychologist, found Plaintiff had "an exaggerated loss of concentration." He also found Plaintiff's inability to remember where he had been in Vietnam and whether he had served in combat was "a highly unlikely response." His tests results were inconsistent, and other findings were "questionable. There was no evidence of PTSD, panic or even high levels of anxiety. Dr. Forfar assessed Plaintiff's GAF at 60-70, indicating "some mild symptoms." Another VA psychiatrist, Dr. Green, opined that, although not a strong possibility, there was a possibility that Plaintiff was greatly exaggerating his symptoms "in an effort to appear as crazy as possible." Although Dr. Van Atta opined the results suggested a frontal lobe pathology, there was no further evidence of this, and he noted that Plaintiff was a "difficult patient," so the diagnosis was "tenuous." In September 2000, Dr. Attia opined that Plaintiff was having serious problems,

"due to poor compliance with treatment." In October he was showing "some deterioration" due to his "noncompliance with treatment. Significantly, in September 2001, Plaintiff reported to his treating psychologist that he "repaired computers and had good days and bad days."

The undersigned finds the above evidence substantially supports the ALJ's determination that Plaintiff was not disabled from his onset date of March 1999, through his Date Last Insured of September 30, 2000, for either SSI or DIB purposes.

## E. Subjective Complaints

Plaintiff also argues the ALJ improperly evaluated his subjective complaints. Defendant contends the ALJ thoroughly considered Plaintiff's subjective complaints in accordance with the Regulations. The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (citing Tyler v. Weinberger, 409 F.Supp. 776 (E.D.Va.1976)).

The Fourth Circuit has developed a two-step process for determination of whether a person is disabled by pain or other symptoms as announced in Craig v. Chater, 76 F. 3d 585 (4th Cir. 1996):

1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but the pain the claimant alleges she suffers. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." Cf. Jenkins, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). Foster, 780 F.2d at 1129 . . . .

2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it

> *affects her ability to work, must be evaluated, See* 20 C.F.R. §§ 416.929(c)(1) &
> 404.1529(c)(1). Under the regulations, this evaluation must take into account not
> only the claimant's statements about her pain, but also "all the available evidence,"
> including the claimant's medical history, medical signs, and laboratory findings, *see
> id.;* any objective medical evidence of pain (such as evidence of reduced joint
> motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§
> 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of
> the impairment, such as evidence of the claimant's daily activities, specific
> descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20
> C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

Craig, supra at 594. In this case the ALJ found in favor of Plaintiff at the Step One, threshold step.

He was therefore required to evaluate the intensity and persistence of Plaintiff's symptoms and the

extent to which they affect his ability to work. A review of the Decision indicates the ALJ discussed

"all the available evidence," including Plaintiff's lengthy medical history, medical signs, and

laboratory findings, evidence of his daily activities, and medical treatment.

In this case, however, ALJ Alexander found Plaintiff not credible mostly based on Plaintiff's

own statements, especially to providers. In this regard, Social Security Ruling ("SSR") 96-7p

provides:

> One strong indication of the credibility of an individual's statements is their
> consistency, both internally and with other information in the case record. The
> adjudicator must consider such factors as:

> > The degree to which the individual's statements are consistent with the
> > medical signs and laboratory findings and other information provided by
> > medical sources, including information about medical history and treatment.

> > The consistency of the individual's own statements. The adjudicator must
> > compare statements made by the individual in connection with his or her
> > claim for disability benefits with statements he or she made under other
> > circumstances, when such information is in the case record. Especially
> > important are statements made to treating or examining medical sources and
> > to the "other sources" defined in 20 CFR 404.1513(e) and 416.913(e). The
> > adjudicator must also look at statements the individual made to SSA at each
> > prior step of the administrative review process and in connection with any

concurrent claim or, when available, prior claims for disability benefits under titles II and XVI. Likewise, the case record may contain statements the individual made in connection with claims for other types of disability benefits, such as workers' compensation, benefits under programs of the Department of Veterans Affairs, or private insurance benefits. However, the lack of consistency between an individual's statements and other statements that he or she has made at other times does not necessarily mean that the individual's statements are not credible. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms. Therefore, the adjudicator will need to review the case record to determine whether there are any explanations for any variations in the individual's statements about symptoms and their effects.

The consistency of the individual's statements with other information in the case record, including reports and observations by other persons concerning the individual's daily activities, behavior, and efforts to work. This includes any observations recorded by SSA employees in interviews and observations recorded by the adjudicator in administrative proceedings.

On March 31, 1996, Plaintiff was admitted to the hospital with complaints of intermittent vague chest pain. He reported a past history of PTSD and a total loss of memory since the Vietnam War due to exposure to Agent Orange. Plaintiff's long-time family doctor admitted he did not ever diagnose or treat Plaintiff for any PTSD or Agent Orange exposure and did not know where that diagnosis came from. In November, VA doctors evaluated Plaintiff for Agent Orange exposure, but the only mental diagnosis was "rule out PTSD." Plaintiff told Dr. Dove he had changes in his short-term memory "since Vietnam." He appeared very anxious, but could perform serial seven's. Dr. Dove diagnosed "probable" PTSD. Two weeks later, although Plaintiff's recall was "excellent," and Plaintiff was doing better on medications, Dr. Dove diagnosed PTSD. Plaintiff told Dr. Dove he was doing well in the daytime but worse in the evening. In August of that year, the VA denied Plaintiff's disability application because none of his symptoms were related to Agent Orange exposure, he had no confirmed PTSD diagnosis, and there was no evidence of a stressful experience sufficient to

actually cause PTSD. Plaintiff subsequently reported being "rather dissatisfied with [the VA's] evaluations and therapies." In January 1997, after extensive evaluation at the VA PTSD Clinic, the VA again denied Plaintiff's disability claim because he had not furnished any information concerning the claimed life-threatening episodes. Plaintiff again told his family physician he was "dissatisfied with [the VA's] help." In fact, though, the record shows that Plaintiff had been sent a letter by the VA requesting information about any traumatic events while in the service, but he did not answer it.

Within a month, however, Plaintiff presented to Dr. King "for a second opinion regarding his experience in Vietnam, and symptoms related to those experiences." He told Dr. King he had "finally" associated his "severe ankle pain" to an experience where there was a jet fuel explosion at an ammunition dump, which "blew him off his cot." He could feel the heat of the flames and the height of the flames caused him to feel that "the world was coming to an end." He also reported a "more prominent memory" that was "recurrent and intrusive," where he saw a 4-5 year old male child fall off a truck in front of him and his truck ran over the child. He also reported memories of "numerous situations where Americans would hunt and kill the natives 'for laughs;'" that a native woman with whom he was living and had a sexual relationship refused to give the MP's at the gate money so she could enter for work and the MP's "shot her to death;" a "multitude of experiences where Americans and Vietnamese were killing each other and themselves, where drug deals gone foul would lead to killing of one American by another;" and a situation where he was in a hootch with 40 Vietnamese women when the Vietcong attacked and the women became hysterical and he had to walk over them. Regarding the latter incident, he "was not able to make direct reference to his actions that led to 'murder,' which has haunted him ever since." He now described his dreams

56

as "wild and crazy" and relevant to themes of killing and death, where people would be running around and dying, mostly civilians. Dr. King diagnosed PTSD.

Then, only one month later, Dr. Fremouw noted Plaintiff had had no traumatic memories or recollections regarding Vietnam. He said he worked in the artillery but was not in heavy combat, although he was in areas where mortar fire came in. He had no spontaneous recall of trauma. Dr. Fremouw diagnosed somatization disorder and anxiety disorder, but not PTSD.

Plaintiff first saw Dr. Attia in May 1997, telling him he "saw a psychiatrist in 1978." He said he was trying to get on disability, and "has been receiving treatment from different family doctors, with no improvement." Dr. Attia noted that "despite the patient's complaint about memory, he was able to give many details . . . . He was able to recall 2 out of 3 words after a few minutes." Also, despite his complaints about inability to concentrate, he was able to do Serial 7's with no problem. Dr. Attia diagnosed Panic Disorder without agoraphobia and rule out mood changes due to general medical condition, but not PTSD.

One month later, Plaintiff told neuropsychologist Boone that since his "attack" in March 1996, he had difficulty with his memory. He claimed to have no memory from the past and no memory of what doctors he had been to in the past year or what procedures were done. Dr. Boone noted, "Curiously, he was able to describe what happened in one physician's office with fairly good detail. He was able to remember the type of test he was given and even remembered some of the test items." He was unable to report his own medical history or that of his family. Dr. Boone noted that despite his complaint of difficulties following instructions and with concentration, Plaintiff was able to follow a detailed map from a different city to the appointment. He had "somewhat hysterical" reactions to test protocols, most remarkable on memory procedures. Dr. Boone opined Plaintiff's

"effort on this evaluation was highly suspect." His memory performance was at "chance" levels on a test specifically designed to detect intentionally exaggerated memory problems. His attention and concentration tested within normal limits. He demonstrated some lapses in attention on one task, but Dr. Boone reported, "it is difficult to know how to interpret that variability given the suspiciousness of his effort." On another memory test, Plaintiff had a "highly unusual pattern suggestive of deliberate attempts to exaggerate cognitive symptomology." Even though his performance ended up being within normal limits, Dr. Boone expressly stated: "Specifically, it was clear that Mr. Devine was not devoting his best effort to many of these tasks, and in fact there is evidence of deliberate exaggeration of cognitive symptomatology." He did believe, however, that Plaintiff was having panic attacks.

The undersigned finds one example of inconsistency in Plaintiff's own reporting rather remarkable, especially considering that it happened within two days. On July 14 1997, Dr. Attia reported that Plaintiff had told him that the VA advised him to enter their PTSD outpatient program Plaintiff, however, told Dr. Attia that "he did not need this service and feels fine." Dr. Attia found Plaintiff "fairly stable." On July 16, 1997, only two days later, Plaintiff called the VA PTSD Clinic and reported he could not attend their PTSD outpatient program, because Dr. Attia told him he was not ready to enter a PTSD treatment program and it would be a while before he would release him to do so. Plaintiff was to notify the VA PTSD Clinic when Dr. Attia "released him" for PTSD treatment (R. 307).

Dr. Forfar opined in September 1999, that Plaintiff's behavior was "remarkable for what appeared to be an exaggerated loss of concentration." Plaintiff claimed he did not remember where he had been in Vietnam or whether he had served in combat or not. Dr. Forfar, a VA psychologist,

found this "highly unlikely." Further, he noted that Plaintiff's test results were internally inconsistent and also inconsistent with results of other tests. Plaintiff's reasoning subscales were "questionable." Plaintiff did not offer any evidence of PTSD. Dr. Forfar concluded that a diagnosis and GAF was difficult to determine due to Plaintiff's "performance." Although under Axis II, Dr. Forfar did diagnose Plaintiff with a personalty disorder, not otherwise specified, under Axis I he diagnosed only "rule out malingering" (R. 683).

Dr. Green opined that Plaintiff's symptoms might be due to an "organic process," including frontal lobe involvement, a tumor or degenerative process. She also felt compelled, however, to comment that, although not a strong possibility, there was a possibility that "this could be greatly exaggerated by the patient in an attempt to appear as crazy as possible." She remained uncertain of Plaintiff's diagnosis. Dr. Van Atta also opined Plaintiff might have a frontal lobe pathology, but commented that Plaintiff was "a difficult patient," so the diagnosis was "tenuous."

The ALJ considered all the above evidence, and more, in concluding that Plaintiff's subjective symptoms and limitations were not credible. "Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984) (citing Tyler v. Weinberger, 409 F.Supp. 776 (E.D.Va.1976)). The Fourth Circuit has also stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" Hays, 907 F.2d at 1456 (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). Here, the undersigned finds there is substantial evidence to support ALJ Alexander's finding that Plaintiff's statements concerning the intensity,

duration, and limiting effects of his impairment-related symptoms were not credible.

## F. Opinion Evidence and Hypothetical to the VE

Plaintiff next argues that the ALJ failed to give sufficient weight to the opinion of his treating physicians, and the resulting hypothetical to the VE is therefore improper. Defendant contends the ALJ complied with the controlling regulations in evaluating the medical source opinions. In Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996), the Fourth Circuit held:

> Circuit precedent does not require that a treating physician's testimony "be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,
>
> > [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.
>
> By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

Dr. Attia completed a "Medical Assessment of Ability to do Work Related Activities (Mental)" on September 25, 2001. He opined that Plaintiff had "no useful ability" in the areas of: understanding, remembering, and carrying out simple job instructions; following work rules; relating to co-workers; dealing with the public; using judgment; dealing with work stresses; functioning independently; and maintaining attention and concentration. He had "poor or no ability" to behave in an emotionally stable manner; relate predictably in social situations; demonstrate reliability; and maintain his personal appearance His ability to interact with supervisors was "seriously limited but not precluded." Dr. Attia opined Plaintiff was suffering from multiple psychiatric symptoms that interfered with his memory and attention and would interfere with his ability to deal with stress and

the public. He also noted that psychological testing showed significant disturbances suggestive of dementia. He also opined Plaintiff's memory and comprehension were affected and that his past experiences interfered with his thought processes, making followup on treatment and work difficult.

The ALJ rejected Dr. Attia's opinion regarding Plaintiff's functional limitations, finding it inconsistent with his own office notes and with other opinions in the record. During the first period of time Plaintiff was being treated by Dr. Attia, he was also being seen at the VA. Three separate VA doctors, neuropsychologist Boone, psychologist Forfar, and psychiatrist Green, all implied or expressly stated the possibility that Plaintiff's symptoms were exaggerated. Dr. Forfar found Plaintiff's report that he could not remember if he had been in combat "highly questionable." Plaintiff's test results were internally inconsistent and inconsistent with the neuropsychological examination performed By Dr. Boone. While Dr. Green opined Plaintiff's symptoms may have been caused by an organic process, she also commented that he might be greatly exaggerating his symptoms "to appear as crazy as possible." While Dr. Van Atta opined Plaintiff's symptoms and test results suggested a frontal lobe pathology, with a possible overlay of psychosis, he also commented that Plaintiff was a "difficult patient" and the diagnosis was "tenuous." As the ALJ noted, Plaintiff said in March 1996, that he had a total loss of memory since Vietnam due to his exposure to Agent Orange. In September 1997, he described numerous traumatic events that he said happened to him in Vietnam, including running over and killing a 4-5 year old boy who fell off a truck. In 2004, that event had changed to running over an infant after its mother dropped it in front of his truck.

Again, it is most telling that Plaintiff told Dr. Attia that he did not need to enter the PTSD program, then told the PTSD program that Dr. Attia would not permit him to go. It is also

significant to the undersigned that the VA continuously denied Plaintiff's service-connected disability for PTSD, except during one period from sometime after 1999 until 2003, when a C&P examiner reduced it back to 10%. Before that, he had been receiving compensation for "non-service connected PTSD." However, the undersigned finds there is absolutely no evidence or even mention of any traumatic event except those that involved Vietnam.

Plaintiff contends that Dr. Joseph's RFC does not substantially contradict Dr. Attia's long-standing diagnosis of PTSD, or lend support to ALJ Alexander's attack upon his character and credibility. The undersigned disagrees. Dr. Attia opined that Plaintiff had no useful ability in the areas of: understanding, remembering, and carrying out simple job instructions; following work rules; relating to co-workers; dealing with the public; using judgment; dealing with work stresses; functioning independently; and maintaining attention and concentration. He had poor or no ability to behave in an emotionally stable manner; relate predictably in social situations; and demonstrate reliability. His ability to maintain his personal appearance and ability to interact with supervisors were seriously limited but not precluded. Dr. Attia opined Plaintiff was suffering from multiple psychiatric symptoms that interfered with his memory and attention and would interfere with his ability to deal with stress and the public. He also noted that psychological testing showed significant disturbances suggestive of dementia. He also opined Plaintiff's memory and comprehension were affected and that his past experiences interfered with his thought processes, making followup on treatment and work difficult.

Dr. Joseph did find that Plaintiff's "reported" symptoms appeared to be consistent with PTSD. She found he had PTSD "per medical record." Dr. Joseph also found, however, that Plaintiff's socialization was only mildly impaired, immediate and remote memory were within

normal limits, recent memory appeared moderately impaired, he could remember details of his past history, judgment was within normal limits, insight appeared limited, and concentration was moderately impaired. While Dr. Attia found Plaintiff had <u>poor or no ability</u> to perform in many functional areas, Dr. Joseph found no <u>extreme</u> limitations, which is defined as "no useful ability to function in this area." She also found no limitations at the <u>marked</u> level, which means "severely limited but not precluded." She found he would have moderate limitations on understanding, remembering and carrying out <u>detailed</u> instructions; interacting appropriately with the public, supervisors and coworkers; and responding appropriately to work pressures and changes in a work setting. Moderate is defined as "moderate limitation in this area but the individual is still able to function satisfactorily."

The undersigned finds that Dr. Joseph's opinion varies significantly from Dr. Attia's. Moreover, while the VE testified Dr. Attia's limitations would preclude all work, Dr. Joseph's would not.

Considering all of the above, the undersigned United States Magistrate Judge finds the evidence substantially supports ALJ Alexander's rejection of Dr. Attia's opinion regarding Plaintiff's RFC.

The undersigned also finds that substantial evidence supports the ALJ's hypothetical to the VE. ALJ Alexander sent Plaintiff to Dr. Joseph for a consultative evaluation. As already noted, she found Plaintiff would have moderate limitations on understanding, remembering and carrying out <u>detailed</u> instructions; interacting appropriately with the public, supervisors and coworkers; and responding appropriately to work pressures and changes in a work setting. Moderate is defined as "moderate limitation in this area but the individual is still able to function satisfactorily." The ALJ

restricted Plaintiff to low stress jobs with no production line type of pace or independent decision-making responsibilities; involving only routine and repetitive instructions and tasks; with minimal, no more than occasional, possible interaction with other persons. The VE testified there would be a significant number of jobs available to a hypothetical individual with those limitations.

The ALJ may rely on VE testimony to help determine whether other work exists in the national economy that the claimant can perform. 20 C.F.R. §§ 404.1566(e), 416.966(e). The Fourth Circuit has held that "[t]he purpose of bringing in a vocational expert is to assist the ALJ in determining whether there is work available in the national economy which the particular claimant can perform." Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). When "questioning a vocational expert in a social security disability insurance hearing, the ALJ must propound hypothetical questions to the expert that are based upon a consideration of all relevant evidence of record on the claimant's impairment." English v. Shalala, 10 F.3d 1080, 1085 (4th Cir.1993) (citing Walker v. Bowen, 876 F.2d 1097, 1100 (4th Cir.1989)). The reviewing court shall consider whether the hypothetical question "could be viewed as presenting those impairments the claimant alleges." English v. Shalala, 10 F.3d 1080, 1085 (4th Cir. 1993). Finally, in Koonce v. Apfel, 166 F.3d 1209 (4th Cir 1999), the Court held that an ALJ has "great latitude in posing hypothetical questions" and need only include limitations that are supported by substantial evidence in the record.

The undersigned finds substantial evidence supports the ALJ's hypothetical to the VE. The ALJ was therefore entitled to rely on the VE's testimony in determining that other jobs existed in significant numbers that Plaintiff could perform.

For all the above reasons, the undersigned United States Magistrate Judge finds substantial evidence supports ALJ Alexander's decision that Plaintiff was not disabled through the date of his decision.

## V. Recommended Decision

For the reasons above stated, I find that substantial evidence supports the Commissioner's decision denying the Plaintiff's applications for DIB and SSI. I accordingly recommend that Defendant's Motion for Summary Judgment [Docket Entry 18] be **GRANTED**, Plaintiff's Motion for Summary Judgment [Docket Entry 13] be **DENIED**, and that this action be **DISMISSED and RETIRED** from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Recommendation for Disposition, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _20_ day of February, 2008.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE